**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| CATHERINE HAYES, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| TUFTS UNVIERSITY, TUFTS UNIVERSITY SCHOOL OF DENTAL MEDICINE, LONNIE H. NORRIS, and A. JOSEPH CASTELLANA, | ) |
|  | ) |
| Defendants. | ) |

**COMPLAINT, JURY DEMANDED**

## I. INTRODUCTION

1. This is an action brought by Catherine Hayes, the former Professor and Chair of the Department of Public Health and Community Service at the Tufts University School of Dental Medicine, for gender discrimination and retaliation in violation of M.G.L. c. 151B, § 4(1), (4) and/or (5); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*; the Massachusetts Equal Pay Act, M.G.L. c. 149, § 105A; and/or the Federal Equal Pay Act, 29 U.S.C. §§ 206 and/or 215. The case arose when the Plaintiff raised complaints to her supervisors in April 2009 after discovering that she was being paid at a rate nearly 70 percent lower than a male Department Chair hired around the same time as her. Prior to raising her complaints, the Plaintiff was a well respected member of the University and Dental School communities. Ironically, the Plaintiff was honored by the University for her work in addressing inequities in health just a few weeks prior to raising her salary inequity issues. However, after the Plaintiff raised her claims of gender pay inequity, the University, the School, and her supervisors engaged

in a pattern of retaliatory and discriminatory activity that caused a seismic shift in the Plaintiff's working conditions and ultimately led to her constructive discharge from employment.

## II.     PARTIES

2.     Plaintiff Catherine Hayes is an adult female resident of Newton, Massachusetts.

3.     Defendant Tufts University ("Tufts" or the "University") is a Massachusetts not-for-profit corporation operating as an independent university with administrative offices located in Medford, Massachusetts.

4.     Defendant Tufts University School of Dental Medicine ("TUSDM") is a research and teaching institution within Tufts with its main facility and administrative offices located in Boston, Massachusetts.

5.     Defendant Lonnie H. Norris is an adult male resident of Wellesley, Massachusetts, and has served as the Dean of TUSDM at all relevant times.

6.     Defendant A. Joseph Castellana is an adult male resident of Boston, Massachusetts, and has served as the Executive Associate Dean of TUSDM at all relevant times.

## II.     STATEMENT OF FACTS

### A.     Background Regarding Dr. Catherine Hayes.

7.     The Plaintiff is a state-licensed dentist, board certified in dental public health, who holds a Doctor of Dental Medicine (D.M.D.) degree from Tufts University as well as a Master of Science (M.S.) degree and an additional Doctor of Medical Science degree, both from Harvard University.

2

8.  From August 26, 2006, until on or about September 21, 2010, the Plaintiff served as a full tenured professor in an endowed professorship and Chair of the Department of Public Health and Community Service at TUSDM.

9.  Prior to her most recent tenure at TUSDM, the Plaintiff had previously been on the faculty at TUSDM from 1993 to 1998, attaining the rank of Associate Professor before leaving Tufts to take an Assistant Professorship at the Harvard Medical School, School of Dental Medicine and School of Public Health in 1998.  The Plaintiff willingly accepted a lower-ranked professorship in order to attain a coveted spot in such a prestigious program and on the Harvard faculty, and she was ultimately promoted to Associate Professor at Harvard in 2003.

10. In June 2006, the Plaintiff was recruited and strongly encouraged to accept an offer to return to TUSDM as a full professor in an endowed professorship and Chair of TUSDM's new Department of Public Health and Community Service.

11. The department that the Plaintiff chaired was the first new department at TUSDM in nearly 50 years.  In launching this department, the Plaintiff developed and revitalized a number of important programs, including but not limited to pre-doctoral teaching programs for dental students to obtain experience in pediatric dentistry; a Step-Up Dental program in Boston Public Schools; and the Bridge Over Troubled Water program, a free dental clinic for homeless teens.  In addition, the Plaintiff's position requires advocacy with legislators, government officials, and other advocates on a regular basis.

12. The Plaintiff's offer letter of June 2, 2006, (attached hereto as Exhibit A) provided the Plaintiff a starting salary of $180,000 — $150,000 in base salary and an additional $30,000 funded from grant support.  The letter also contained a guarantee that her salary would

3

not be reduced below the base salary of $150,000, plus annual merit increases beginning in August 2006.

13. As regards the grant support, the Plaintiff brought with her to Tufts federally funded grants for the upcoming academic year 2006-2007 in the amount of $89,557. Despite bringing in nearly $90,000 in grant support – including more than $55,000 specifically dedicated to salary – TUSDM offered the Plaintiff a salary package that included only $30,000 in grant supported funds. The Plaintiff therefore ostensibly ceded $60,000 back to TUSDM for the first year alone.

14. The Plaintiff made the concession described in the preceding paragraph with the understanding that the remainder of the grant funding would be available to her in the event that a grant ended or the Department needed funding for another purpose. The Plaintiff requested to have this understanding in writing, but the Defendant Castellana demurred, indicating that Tufts legal counsel insisted on the wording regarding the potential salary cut. Although the Plaintiff repeatedly told Defendant Castellana that she was not comfortable with that language in the offer letter, Defendant Castellana assured her that the language was "boilerplate" and that her salary would not be cut.

15. Despite Defendant Castellana's indication that the Plaintiff's salary would not be cut, TUSDM began trying to cut her salary within four months of her hire as Chair. In or around January 2007, Defendant Castellana directed the Director of Finance and Administration to discuss a salary reduction with the Plaintiff on the grounds that two grants that the Plaintiff held were ending, when in point of fact, those two grants were ending in July *2008*, not July *2007*. The Plaintiff expressed her dismay to the Finance Director both that this discussion was premature and that it was unnecessary, since the Plaintiff believed that she had an agreement

with the Defendants that her salary would not be cut. When she questioned Defendant Castellana about the premature and inappropriate attempt to cut her salary, Defendant Castellana again assured the Plaintiff that her salary would not be cut; however, the Finance Director again approached the Plaintiff regarding a potential salary cut in May 2007, and the Defendants attempted to cut her salary again in August 2008 even though the gap in time between her retiring grants and her new grants was only two weeks.

16. Upon information and belief, no male Department Chair has suffered such attempts to reduce his salary as did the Plaintiff.

17. The Plaintiff's appointment at TUSDM was a full-time, five-day-per-week appointment, which included protected (and funded) research time of two days per week to ensure that she would be able to fulfill the requirements of her existing federally funded grants and any future grants she might bring to TUSDM – grants that funded her salary and provided additional funding above and beyond her salary that TUSDM used for its own purposes (without her input or consultation). Moreover, despite this agreed-upon research time, the Plaintiff regularly spent *far more* than three eight-hour days in attendance at TUSDM each week during her tenure there and worked on evenings and weekends to handle the extraordinary task that she was charged with.

**B.   The Status of the Plaintiff's Grant Funding in 2008 and the Respondents' Attempt to Cut and Cap Her Salary**

18. One of the Plaintiff's initial grants was slated to end on July 31, 2008. However, prior to that time, she had already secured an additional grant with a colleague from Tufts University School of Medicine, which was to begin on August 15, 2008 – a mere two weeks after the other grant ended. Despite the fact that the $121,000 in grant funding that she had *not*

used should have been available to fund her salary at the existing level, TUSDM insisted on cutting her salary.

19.In letters dated July 16 and September 4, 2008, that sought to modify the Plaintiff's salary, (attached hereto as Exhibits B and C), the Defendants also sought to place a cap on the Plaintiff's earnings at a level well below the salary of a male Department Chair hired at the same time as The Plaintiff.  [*See infra* ¶ 22.]

20.Upon information and belief, the Defendants have never tried to place a cap on the salary of any male Department Chair as they did with the Plaintiff.

21.The Plaintiff opposed the decision to cap her salary and spoke with Defendant Norris, who instructed Defendant Castellana to rewrite the letter.  This second letter, which the Plaintiff received in September 2008, stated that the Plaintiff's salary would not fall below her starting salary of $180,000; however, the letter made unclear whether the cap on her salary was actually removed.  In this regard, the language that replaced the initial salary cap (as described in the July 2008 letter) places obstacles in the path of salary increases and suggests that any increase would have to be approved by the University for a faculty member of the Plaintiff's rank.

**C.The Plaintiff's Discovery of Gender-Based Salary Inequities.**

22.In March 2009, the Plaintiff learned that the male Chair of the TUSDM Department of Pediatric Dentistry, who was hired at the same time and at the same rank but at a lower full-time equivalent than the Plaintiff, was earning $250,000 per year – as compared to the $184,000 she was then earning.  Thus the male department chair was earning approximately 70 (seventy) percent more than the Plaintiff in relation to the full-time equivalent status of their positions.

23. The Plaintiff approached Defendant Norris about the discrepancy on April 29, 2009, and he verbally confirmed the difference in pay. When asked to explain the reason for the discrepancy, Defendant Norris could not explain the reason for the discrepancy but stated only that TUSDM used information from the American Dental Education Association. The plaintiff asked for a list of criteria and any other information used in calculating salaries to help her understand this alarming salary discrepancy. Defendant Norris did not mention any algorithms or any other criteria that the Defendants later used to explain the salary inequity after the Plaintiff filed claims against the Defendants. The Defendants have no published guidelines relating to salary levels for Department Chairs at TUSDM.

24. The Plaintiff received further confirmation of the salary inequity in data presented to her in a meeting with Defendant Norris and Defendant Castellana on July 15, 2009, which data is attached hereto as Exhibit D. The chart entitled "Years of Service and Salary Per Session," which shows the salaries for all Department Chairs, plainly shows only two employees with three years of service and clearly documents the higher salary level of the Pediatric Chair.

25. The Plaintiff's department contains seven divisions employing 115 faculty and staff positions as compared to the two divisions and 16 employees in the Pediatrics Department. In addition, the Chair, faculty and staff of the Department of Public Health and Community Service operate seven clinics serving adults with special needs, two operating room programs, nearly 200 school-based programs throughout the state, 27 externships nationwide (including three military sites), as well as pre- and post-doctoral education and research programs. Additionally, the Plaintiff was responsible for state-wide and nation-wide advocacy in issues of dental public health.

26. Several months after first raising the gender pay inequity to her supervisors, on or about September 18, 2009, the Plaintiff, together with her counsel, met with the Defendants and their counsel to discuss ways to address both the question of pay disparity and the problematic mandatory reporting requirement between the Plaintiff and Defendant Castellana.  As a result of that meeting, the Defendants agreed to undertake an independent salary study and to have a neutral third party be involved in the meetings and correspondence between the Plaintiff and Defendant Castellana.  On or about March 1, 2010, the Defendants reiterated their agreement to have a third party participate in meetings between the Plaintiff and Defendant Castellana.

27. During that conversation on September 18, 2009, and at several points thereafter, the Plaintiff, both herself and through her counsel, asked that the Defendants suspend the mandatory reporting relationship between the Plaintiff and Defendant Castellana while these matters were pending, but the Defendants refused to honor the Plaintiff's request.

28. As they had agreed to do, the Defendants did in fact commission an independent salary analysis after September 18, 2009, and Defendant Castellana indicated to the Plaintiff in early November 2009 that the salary analysis had been completed.  The Plaintiff, through her counsel, requested a copy of the salary analysis and the methodology that was used.  However, the Plaintiff was provided only a vague and incomplete summary of that analysis, prepared by Tufts University Counsel, and no information regarding the methodology.

29. When the Defendants refused to share even a redacted copy of the report with the Plaintiff, she filed a claim of gender discrimination with the Massachusetts Commission Against Discrimination ("MCAD" or the "Commission") on December 18, 2009, and served a copy of the charge on the named Defendants and the University's Office of General Counsel.  (*See* Exhibit E attached hereto.)

30.     Thereafter, on December 23, 2009, the Plaintiff received a hand-delivered letter regarding a new salary adjustment from Defendant Norris (whose office is located in the same building as hers).  Though delivered within the building on December 23, the letter was backdated to December 18, 2009 – the day the charge was filed.  (*See* Exhibit F attached hereto.) The Plaintiff received a second copy of that letter via U.S. mail at her home on December 24, 2009.

31.     In that letter, plainly posted for delivery after the filing and service of the Plaintiff's initial MCAD charge, the Defendants stated that the salary survey "did not support a salary increase due to unlawful gender disparities" but that the Plaintiff's salary would be adjusted to reflect additional grant funds that had been received as of September 15, 2009 – more than three months earlier and prior to her filing of her gender discrimination charge.

**D.      Retaliation Against the Plaintiff After She Opposed the Defendants' Unlawful Discriminatory Practices.**

32.     Prior to the events in question, the Defendants treated the Plaintiff as a highly valued member of the TUSDM and University communities.  In this regard, the Plaintiff was held up by the University as an example of excellence in leadership and community participation.  For example, on April 4, 2009, the Plaintiff received the University Alumni Association's Distinguished Service Award, which is awarded annually to alumni who have demonstrated significant service to the community and to the University.

33.     As noted above, the Plaintiff brought her concerns about the salary inequity to Defendant Norris on April 29, 2009.  In that meeting, Defendant Norris stated that he would look into the matter, and he in fact discussed the situation with Defendant Castellana, who was responsible for negotiating with the Plaintiff and setting her salary.  The Plaintiff then met with

both the Dean and Defendant Castellana on July 15, 2009, to present her annual report, at which time she again discussed her concerns about the salary inequity.

34.     The Plaintiff's relationship with both Defendant Norris and Defendant Castellana began to suffer immediately after she brought her concerns to them in April 2009. This was particularly true of Defendant Castellana, who engaged in hostile and exclusionary treatment of the Plaintiff.

35.     Subsequent to raising complaints of salary inequities, Defendant Castellana changed his manner of communicating with the Plaintiff and placed obstacles in the path of her ability to effectively run her department, including the unilateral cancellation of meetings with the Plaintiff. For example, on or about August 12, 2009, Defendant Castellana unilaterally cancelled the meeting scheduled between him and the Plaintiff scheduled for on or about August 24, 2009.

36.     Defendant Norris was the supervisor of Defendant Castellana and was made aware of Defendant Castellana's hostile behavior toward the Plaintiff; however, Defendant Norris refused to address Defendant Castellana's behavior. As a result, the hostility continued and increased to the point that the Plaintiff ultimately had to resign her tenured position.

37.     In and around July through September of 2009, the Defendants purposefully cut the Plaintiff out of important departmental decisions – including the hiring of faculty and staff – by failing to correspond with the Plaintiff regarding hiring decisions, start dates, and salary levels of the new employee(s) in the department she chaired. The Plaintiff had always been privy to this information in the hiring of other candidates prior to her complaints of gender discrimination.

38. In or around August 2009, the Defendants transferred or attempted to transfer a revenue generating position out of the Plaintiff's department and into the Pediatric Department in a manner that would affect the Plaintiff's departmental budget.

39. In or around September and October of 2009, Defendant Castellana mischaracterized the Plaintiff's actions to Defendant Norris vis-à-vis a joint project with the Tufts University School of Medicine, and Defendant Norris improperly admonished the Plaintiff regarding her actions and incorrectly accused her of violating University policies.

40. In October 2009, the Plaintiff was notified that she would have to participate in an investigation by the University Office of Equal Opportunity (OEO) relating to her complaints of pay discrimination. However, the OEO failed to properly and completely investigate these matters and issued incorrect findings that impugned the Plaintiff's character and contributed to her workplace stress.

41. In or about the Fall of 2009, the Defendants improperly accused the Plaintiff, in a public manner, of running a budget deficit in her Department by, among other activities, placing faculty lines from another department in the budget of the Plaintiff's Department and by not applying existing grant funding to offset her Department's expenses, and thereby impugned her professional abilities and jeopardized her position.

42. From about September 2009 to September 2010, the Defendants publicly misrepresented certain of the Plaintiff's actions and conversations with other University and TUSDM employees in an attempt to impugn her professional abilities and jeopardize her position.

43.     In or about the Fall of 2009, the Defendants purposefully cut the Plaintiff out of the budgeting process for FY 2011 and refused her access to financial and budget reports necessary to her involvement in that process.

44.     On or about July 20, 2010, the Plaintiff began a period of physician-approved medical leave under the Family and Medical Leave Act ("FMLA") for reasons relating to the stress caused by the Defendants' actions cited above. Such leave was initially requested for the period of on or about July 21, 2010, through on or about August 16, 2010, and was approved by the University.

45.     Soon after the beginning of the Plaintiff's FMLA leave in July 2010, the Defendants engaged in surveillance of the Plaintiff and her activities while she was out on said leave. Such surveillance continued even after the Plaintiff, through her counsel, notified the Defendants that the Plaintiff's leave was related to stress and not to any physical impairment and that the additional stress of the surveillance was likely to worsen the Plaintiff's condition.

46.     In or about August 2010, the Defendants conducted an audit of the Plaintiff's departmental budget that incorrectly characterized her and her department's activities. Prior to that time, the Plaintiff had never previously been subjected to such an audit but rather had been commended for the responsibility she showed toward her budget activities. Upon information and belief, the Plaintiff was the only TUSDM Department Chair subjected to this kind of audit at this time.

47.     On or about July 16, 2010, and throughout August 2010, the Defendants sent the Plaintiff harassing emails detailing increased scrutiny of her Department.

48. On or around August 6 through 12, 2010, during the period of the Plaintiff's initial FMLA leave, the Defendants deleted all of the emails in the Plaintiff's University email account.

49. The Plaintiff returned to work during the week of August 16, 2010, working at the TUSDM facility on Monday, Tuesday, and Wednesday and working remotely on Thursday and Friday.

50. On or about August 20, 2010, the Plaintiff's treating physician provided a letter indicating the need for the Plaintiff to continue her medical leave for an additional week so that the Plaintiff could be evaluated by a specialist. (See attached Exhibit G.)

51. On or about August 23, 2010, the Defendants denied the Plaintiff's request to extend her medical leave, purportedly due to the insufficiency of her physician's letter. (See attached Exhibit H.) The Defendants further indicated that the Plaintiff would be placed on unpaid personal leave as of August 16, 2010, purportedly because she had neither been "medically cleared to return to work, nor medically certified to extend [her] medical leave." The Defendants were thus erecting an unnecessary barrier to the Plaintiff returning to work while at the same time refusing to pay her the wages to which she was entitled for the week that she worked, i.e., August 16 through August 20, 2010.

52. When the Plaintiff asked for clarification as to what was required in order to properly request FMLA leave, she was directed to the University's employee handbook as well as to the faculty handbook. Upon a review of those handbooks, the Plaintiff discovered that the Defendants failed to follow their own time frames for submission of FMLA paperwork outlined in those documents.

53. In mid-August 2010, the Plaintiff was informed that, upon her return to work, she would be required to meet one-on-one with Defendant Castellana without any assistance from a neutral third party despite the Plaintiff's requests and the parties' agreement that a neutral third party participate in all meetings between the Plaintiff and Defendant Castellana.

54. Over the next several weeks, the Defendants required the Plaintiff to submit additional paperwork to support her FMLA leave and again applied standards and time frames that were at odds with the directions in the employee and faculty handbooks.

55. Despite her record of leadership and accomplishments, as of September 1, 2010, the Plaintiff received only a one (1) percent merit pay increase when other employees who had not complained of pay inequities received up to two (2) percent merit increases as well as bonuses.

56. Despite the Plaintiff's many attempts from April 2009 through September 2010 to address and rectify both the gender pay disparity and the retaliation she suffered for bringing her complaints forward, the Defendants continued to engage in a pattern of harassing and retaliatory conduct that rendered the Plaintiff unable to return to productive employment at Tufts University. Therefore, on September 20, 2010, the Plaintiff resigned her tenured faculty position effective September 21, 2010.

### III.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

57. On December 18, 2009, the Plaintiff filed a charge of discrimination against the Defendants in MCAD Docket No. 09BEM03347, EEOC Number 16C-2010-00567. (See Exhibit E attached hereto).

58. On May 26, 2010, the Plaintiff filed a second charge of discrimination in MCAD Docket No. 10BEM01384, EEOC Number 16C-2010-01680. (See Exhibit I attached hereto).

14

59. On August 25, 2010, the Plaintiff filed a third charge of discrimination in MCAD Docket No. 10BEM02199, EEOC Number 16C-2010-02306. (See Exhibit J attached hereto).

60. On or about August 25, 2010, and again on September 14, 2010, the Plaintiff requested permission to withdraw her complaints before the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission in order to file a private cause of action in civil court.

61. On or about September 21, 2010, the Massachusetts Commission Against Discrimination dismissed the Plaintiff's complaint pursuant to Mass. Gen. Laws c. 151B, § 9 based on Plaintiff's request to file an action in civil court. (Seek Exhibits K, L, and M attached hereto).

## COUNT I
## STATE GENDER DISCRIMINATION LAW

62. Plaintiff adopts and incorporates Paragraphs 1 through 61.

63. By their actions described above, the Defendants have discriminated against the Plaintiff in terms of her compensation and conditions of employment as a result of her sex in violation of Mass. Gen. L. c. 151B, § 4(1) and/ or Mass. Gen. L. c. 93, § 102.

## COUNT II
## FEDERAL GENDER DISCRIMINATION LAW –
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

64. Plaintiff adopts and incorporates Paragraphs 1 through 61.

65. By their actions described above, the Defendants have discriminated against the Plaintiff in terms of her compensation and conditions of employment as a result of her sex in violation of 42 U.S.C. § 2000e-2.

## COUNT III
## STATE EQUAL PAY ACT

66. Plaintiff adopts and incorporates Paragraphs 1 through 61.

67. By their actions described above, the Defendants have discriminated against the Plaintiff in payment of wages as a result of her sex in violation of Mass. Gen. L. c. 149, § 105A.

## COUNT IV
## FEDERAL EQUAL PAY ACT

68. Plaintiff adopts and incorporates Paragraphs 1 through 61.

69. By their actions described above, the Defendants have discriminated against the Plaintiff in payment of wages as a result of her sex in violation of 29 U.S.C. § 206(d).

## COUNT V
## RETALIATION UNDER STATE AND
## FEDERAL ANTIDISCRIMINATION AND EQUAL PAY LAW

70. Plaintiff adopts and incorporates Paragraphs 1 through 69.

71. By their actions described above, including by constructively discharging the Plaintiff from her employment, the Defendants have retaliated against the Plaintiff for raising her claims of sex discrimination and gender pay inequities in violation of Mass. Gen. L. c. 151B, § 4(4); 29 U.S.C. § 215(a)(3); and/or 42 U.S.C. § 2000e-3.

## COUNT VI
## INTERFERENCE WITH RIGHTS UNDER STATE ANTIDISCRIMINATION LAW

72. Plaintiff adopts and incorporates Paragraphs 1 through 69.

73. By their actions described above, the Defendants have interfered with the Plaintiff's rights under Chapter 151B and/or have aided, abetted, incited, compelled or coerced

the doing of certain the acts forbidden by Chapter 151B in violation of Mass. Gen. L. c. 151B, § 4(5).

WHEREFORE, the Plaintiff requests that this Court enter the following relief:

1. Back pay, front pay, lost benefits, emotional distress damages, punitive damages;

2. Attorney's fees and costs;

3. Any other relief to which the Plaintiff may be entitled.

### JURY DEMAND

The Plaintiff hereby demands a trial by jury on all of her claims so triable.

Respectfully submitted,

CATHERINE HAYES

By her attorneys,

/s/ Alfred Gordon
Alfred Gordon, BBO #630456
PYLE ROME EHRENBERG, PC
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Dated: October 28, 2010